IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WYATT WILLIAMS,       )
                            )
        Plaintiff,       )
                            )
v.                       )     CIVIL ACTION NO. 00-JEO-1733-S
                            )
THE GOODYEAR TIRE          )
& RUBBER COMPANY,        )
                            )
        Defendant.     )

## MEMORANDUM OPINION

In this action, plaintiff Wyatt Williams (hereinafter "Williams" or "the plaintiff"), an employee of The Goodyear Tire & Rubber Company (hereinafter "Goodyear" or "the defendant") asserts various claims of race discrimination against the defendant in violation of 42 U.S.C. § 1981. Presently, before the court is the defendant's motion for summary judgment as to all of the claims (doc. 13) and its motion to strike the affidavits of Gordon Richardson and Vallie Thomas that were submitted by the plaintiff in opposition to the motion for summary judgment (doc. 22). Upon due consideration, the court finds that the motion to strike and the motion for summary judgment are due to be granted in part and denied in part

## I. PROCEDURAL BACKGROUND

When the plaintiff initially filed his complaint, he alleged that he was subjected to disparate treatment in salary and work opportunities and to a racially hostile work environment. (Doc. 1). The defendant filed the pending motion for summary judgment and has submitted a brief and evidentiary material in support thereof. (Doc. 14 & 15). The plaintiff filed a brief in opposition to the defendant's motion and also submitted evidentiary material in support of his

brief. (Doc. 17 & 18).

## II. FACTUAL SUMMARY[1]

### A. Background

The plaintiff is an African-American male who was employed by the defendant for almost fourteen years. He is an automotive technician with a number of designated "automotive speciality areas," including engine repair, suspension and steering, brakes and engine performance. (Doc. 17, Ex. 3). Goodyear manufactures tires and other rubber products and operates retail automotive service centers where it sells automotive products and offers automotive repair and maintenance services. (Williams Depo. at 16-17).[2] He worked for Goodyear as an automotive technician at three different automotive service centers. (*Id.* at 16-18). The center involved in this litigation is the one located in the Roebuck area of Birmingham, Alabama. (*Id.*). He began working there in about 1995. (*Id.* at 18).

As a part of his duties, the plaintiff performs mechanical work on vehicles including working on brakes, front ends, suspension, alignments, tune-ups, transmissions (flushes), air conditioning and related repairs. (Williams Depo. at 27-29). The Goodyear technicians do not work on internal engines or preform major transmission work. (Williams Depo. at 22-23;

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia,* 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The court notes that much of the statement is derived from the defendant's "Undisputed Facts" section of its memorandum and the plaintiff's "Statement of Additional Undisputed Facts," other than those portions that plaintiff demonstrates to be incorrect or in actual dispute.

[2] This deposition is found at exhibit 15, tab 1.

Putman Depo. at 77-78;[3] Putman Aff. at ¶ 6[4]).  These jobs are referred to other automotive shops. (Putman Depo. at 77-79).  "There are, however, a number of jobs which do not fall within a 'gray area.'  The gray area jobs are not technically considered 'internal engine' work, but are normally referred to other automotive shops if the store does not have an experienced automotive technician to perform the jobs."  (Putman Aff. at ¶ 6; Putman Depo. at 77-79).

### B. The Roebuck Service Center

During the relevant time, the Roebuck Service Center employed two to three automotive technicians.  (Williams Depo. at 25).  When the plaintiff started at Roebuck in 1995, there were three automotive technicians: the plaintiff, Stanley King (black), and Jerry ("J.R.") Rylant (white).  (Williams Depo. at 38, 85; Putman Depo. at 12, 91).  Rylant went on disability leave in May 1998 and never returned to work.  (Putman Aff. at ¶ 2).  In August 1998, he was replaced by Albert Huey (white), who remained at Goodyear until April 2000.  (Williams Depo. at 85-86; Putman Depo. at 22-23 & Ex. 3).  King left Goodyear in December 1999.  (Putman Depo. 12-13).  This position was eventually filled by Jimmy Dennison (white) in February 2000. (Williams Depo. 86; Putman Depo. 8).[5]

During the relevant period, the staff of a Goodyear Service Center generally included a store manager, service manager, customer service representative, and two to three general service employees.  (Williams Depo. at 27).  Harold Putman was the store manager at Roebuck.

---

[3] This deposition is found at exhibit 15, tab 2.

[4] This affidavit is found at exhibit 15, tab 3.

[5] The defendant also notes that "[s]ince July 1998, two temporary technicians have worked, for a brief period of time, at the Goodyear Roebuck store: Edmond Willis and Paul Van Camp. (Williams Depo. 84-86)." However, after reviewing the record, the court does not find this significant.

3

(Putman Depo. at 7; Williams Depo. at 30). Daryl Spiegle was the service manager, and the plaintiff's immediate supervisor, until he was transferred to another Goodyear Service Center in July 2000 following an incident involving the plaintiff. (Williams Depo. at 50, 198-199; Putman Depo. at 9-11). In the incident, Spiegle was ordering parts and telling the supplier that "there's no rush on them." (Williams Depo. at 197). The plaintiff went to see Putman about the situation. When they went outside and talked to Spiegle, he (Spiegle) "blurted out, well, why don't you just kiss his black ass while you're at it?" (*Id.* at 197-98). The plaintiff turned to Putman and asked if he had to put up with that and Putman told him he did not. As a consequence, Spiegle was moved to another store. (*Id.* at 198-99).

In about June 1999, Williams was "revving" a customer's automobile in the shop to diagnose a "driveability problem." (Williams Depo. at 176). Because the car's exhaust system was not intact, it was very loud when he revved it. Putnam was inside the store on the phone and had to get off because of the noise that Williams was making. (Putman Depo. at 87). He went to the shop area to talk with Williams. At some point during the conversation, Putman put his hand on Williams' shoulder near his neck. (*Id.* at 88; Williams Depo. at 178). Williams called the Goodyear personnel office in Atlanta. (Putman Depo. at 67-68). Putman clocked him out of work for the day while he was calling. (*Id.*). The personnel director called and talked with Putman about the incident after he talked with Williams.

The plaintiff also articulated other incidents that occurred at the Roebuck Store. According to the plaintiff, Rylant, a coworker, "used the 'N' word" and told "some sort of concocted racial joke." (Williams Depo. at 36, 193). He could not recall the joke because "it went in one ear and out the other." (*Id.* at 194). He did not complain to anyone in management

4

about either incident.  (*Id.*).  He also stated that Spiegle would also tell racial jokes, but he could not recall any specifics other than the fact that during one of the jokes Spiegle "made a reference between blacks and monkeys."  (*Id.* at 195, 200-01).  Doug Smith, a co-employee, also told similar jokes, but the plaintiff did not complain because he felt that Smith was "mentally slow" and he was just repeating what he saw and heard.  (*Id.* at 201-03).  The plaintiff also cites to an incident involving the police being called to the store.  It happened around April 1, 2000.  Spiegle had told the plaintiff not to align a particular car because he was going to do it when he returned.  (Putman at 56-60).  He then left to pick up a part and the plaintiff asked a salesman in the front office if he could do the alignment.  (*Id.* at 57).  The salesman said he could.  (*Id.*).  When Spiegle returned, he was upset.  (*Id.*).  Spiegle yelled at he plaintiff.  (*Id.* at 55-56).  The plaintiff was told by Spiegle to leave for insubordination, but refused to leave.  (*Id.* at 52-54).  The police were called.  Spiegle ultimately left.  (*Id.* at 54-55).

## C. Automotive Technicians

### 1. Labor Hours

An automotive technician's compensation is based in part upon a calculation of the "labor hours" credited during each payroll period.  (Williams Depo. at 40-45; Putman Depo. at 39-40).[6] "Labor hours" are based on a "book estimate" of the time it takes to complete a particular job.  (Williams at Depo. 41-42; Putman Aff. at ¶ 9).  The time estimate is contained in a rate book, The Mitchell Manual, established based on industry standards.  (Williams Depo. at 41-42; Putman Aff. at ¶ 9).  For instance, if the manual estimate for a brake job is two hours, the

---

[6] If an employee works at least 40 hours in a work week, he is guaranteed 30 hours of pay even if he does not perform 30 "labor hours."  (Williams Depo. at 45; Putman Depo. at 39).

automotive technician is credited for two labor hours for performing the brake job, even if the job actually takes more or less time to complete. (Williams Depo. at 42-43). Thus, an automotive technician who can "beat" the estimated time will be free to work on other jobs and receive more labor hours than a technician who cannot work as quickly and accurately. (Williams at Depo. 43). The posted work schedule for an automotive technician is 8 a.m. to 5 p.m., however, management authorizes automotive technicians to work beyond the posted hours in an effort to obtain more labor hours. (Putman Aff. at ¶ 8).

### 2. Work Allocation

The work to be done is assigned on a "[f]irst come, first serve" basis. (Williams Depo. at 160). Customer work orders are prepared and placed on a hook in order of receipt with the newest orders placed in back. (Williams Depo. at 121-122; Putman Depo. at 31-34). Automotive technicians select the front tag on the hook, review the work order, inspect and diagnose the vehicle, write up required repairs or part orders and return the work order to the service manager. (Williams Depo. at 128; Putman Depo. at 31-34). The service manager prepares a computerized estimate and contacts the customer for authorization to perform the work. (Williams Depo. at 127-128, 130-131). After the automotive technician has completed a job or while he is waiting on a part to arrive, he can take additional work orders from the hook. (*Id.* at 160).

The "one hook" work order system was implemented in 1995 or 1996. (Putman Depo. 31-36). Prior to that time, each automotive technician was assigned tickets. (*Id.* at 32, 35). J.R. Rylant, one of the automotive technicians, complained that service manager Spiegle was assigning him less favorable jobs. (*Id.* at 32-34). Rylant is white. (*Id.* at 91). In an effort to

6

eliminate any perception of favoritism, Putman implemented the one hook system. (*Id.* at 31-34).

### 3. Hourly Rates

In June 1998 the plaintiff was the highest paid automotive technician at the Roebuck store, making $13.47 per hour. (Putman Aff. at ¶ 2). On March 5, 1999, the plaintiff's rate increased to $14.00 per hour. (Putman Aff. at 11). In February 1999 Albert Huey received a raise to $14.25 per hour. (Putman Aff. at ¶¶ 5-10; Putman Depo. 47 & Ex. 3). Huey remained at this rate of pay until his resignation on April 3, 2000. (Putman Depo. 47, Ex. 3).

Huey's hourly rate in 1999 was slightly higher than the plaintiff's because Putman, the Store Manager, concluded that Huey's performance and experience was better than the plaintiff's. (Putman Aff. at ¶¶ 5-10). Huey had run a full service automotive repair shop prior to his employment at Goodyear which gave him experience beyond the type of work performed at Goodyear service centers. (Putman Depo. at 50; Putman Aff. at ¶¶ 6-7). For certain jobs, unless a qualified technician works at a Goodyear service center, Goodyear refers the work elsewhere. (Putman Depo. at 79). Huey had the experience to perform certain jobs at Goodyear, such as repairing a clutch, which would normally need to be referred. (Putman Depo. at 79).[7] Based on his experience and overall performance, Putman recommended Huey for a slightly higher raise, which was approved by District Manager, Doug Archer. (Putman Aff. at ¶ 10).

In July 2000 Goodyear hired Johnny Dennison, white, as an automotive technician at an hourly rate of $14.00 per hour. (Putman Aff. at ¶ 14). He is not authorized to do as much work

---

[7] There are certain jobs which Goodyear automatically refers out, such as internal engine work, transmission repair, and transmission rebuild work. (Putman Depo. 76-78). Other jobs fall into a "gray area" where it could and usually is referred out, but if a technician is qualified to perform the work then it will be done. (Putman Depo. 78-79).

as the plaintiff. For instance, he does not work on timing belts, heater cores or Cadillacs.
(Williams Depo. at 120-21). The plaintiff's rate was raised in December 1, 2000, to $14.56 per
hour making him the highest paid automotive technician again. (Putman Aff., ¶ 11; Putman
Depo. 48 & Ex. 3).

**III. Summary Judgment Standard**

      Summary judgment is to be granted only if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the declarations, if any, show that there is
no genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.
2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden
to show the district court, by reference to materials on file, that there are no genuine issues of
material fact that should be decided at trial. Only when that burden has been met does the burden
shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that
precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991);
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

      The movant can meet this burden by presenting evidence showing there is no dispute of
material fact, or by showing that the nonmoving party has failed to present evidence in support of
some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at
322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e)
"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the
'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts
showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman,*

9

873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen,* 121 F.3d at 643.

## IV.  MOTION TO STRIKE PORTIONS OF THE PLAINTIFF'S EVIDENCE

The defendant asks the court to strike certain of the affidavits submitted by the plaintiff in opposition to the motion for summary judgment. FEDERAL RULE OF CIVIL PROCEDURE 56 states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). "If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion [or portions]." *Ali v. City of Clearwater,* 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc.,* 1993 WL 229601, *2 (M.D. Fla. June 23, 1993) and *Barnebey v. E.F. Hutton & Co.,* 715 F. Supp. 1512, 1529 (M.D. Fla. 1989).

## A. Richardson's Affidavit

The defendant moves to strike Richardson's affidavit in its entirety because it contains "irrelevant conclusory statements." (Doc. 22, ¶ 1). Richardson states the following in his affidavit:

> My name is Gordon Richardson and I do hereby swear and affirm the following facts are true and correct and that I have firsthand knowledge of the same. I am a resident of the State of Alabama and I am over the age of nineteen.
>
> I was employed at The Goodyear Tire & Rubber Company at the Eastwood location as an Auto Tech at the same time as Wyatt Williams prior to his going to the Roebuck location. Mr. Williams and I both worked as Auto Techs. In my opinion, Mr. Williams was the best Auto Tech I have seen. I have worked with many different Auto Techs but Wyatt is the best. He is the fastest and most efficient Auto Tech I have seen and he can do any type of work on a vehicle. He was always a very hard worker and did whatever jobs Goodyear needed him to do. He did not turn down or refuse any work that needed to be done. In fact, if I were going to take my car to someone to be repaired or serviced, I would take it to Wyatt Williams.

(Doc. 17, Ex. 5). The defendant began working in the Roebuck location around 1995. Thus, the affidavit must be based on his observations before that date. Richardson also does not reference any familiarity with the plaintiff's comparator, Albert Huey. Under these circumstances, the court finds that it is due to be struck because it does not contain pertinent information for purposes of comparison.

Additionally, the court notes that the affidavit is not in the proper form. First, it is not notarized or dated. Still further, it does not meet the alternative requirements of 28 U.S.C. § 1746 in that it is not executed "under penalty of perjury" and it is not dated. 28 U.S.C. § 1746.

## B. Thomas' Affidavit

The defendant asserts that Thomas' affidavit is due to be struck because "it flatly contradicts his prior sworn testimony." (Doc. 22, ¶ 2). Thomas states the following in his

11

affidavit:

> My name is Vallie Thomas and I do hereby swear and affirm the following facts are true and correct and that I have firsthand knowledge of the same. I am a resident of the State of Alabama and I am over the age of nineteen.
>
> I was employed at The Goodyear Tire & Rubber Company at the Southside location as an Auto Tech from approximately 1984-2000. My supervisor was Darryl Spiegle. I was the only African-American Auto Tech employed there at the time. Mr. Spiegle would regularly pull tickets and give the favorable jobs to the Caucasian Auto Techs employed there. This happened so frequently that I called the Goodyear toll-free telephone number to report what was happening. However, nothing was done and Mr. Spiegle continued his practice of pulling tickets.

(Doc. 17, Ex. 6). At his deposition in an unrelated lawsuit against the defendant, he stated:

> Q.    . . . . when is the last day that you've (sic) actually physically gone to work for
>
> Goodyear?
>
> A.    It was in June of '99.
>
> Q.    All right.  June 2nd of 1999?
>
> A.    No.
>
> Q.    All right.  Do you remember what day in June?
>
> A.    It was at the latter part of June.
>
> Q.    And you haven't worked at all since the latter part of June of 1999?
>
> A.    Latter part of June, first part of July, something like that.

(Doc. 22, Ex. 1, pp. 84-85).  During additional questioning at the deposition, the colloquy was as follows:

> Q.    When did you go back [to work] the second time?
>
> A.    June the 28th.
>
> Q.    And do you remember how long you stayed at work on that occasion?

A.   Not exactly how long, no.

Q.   Was it a matter of a few days?

A.   Yes, some days, yes.

Q.   And then after that, you took off work and have not – or taken off work and have not been back to work since?

A.   Correct.  Correct.  Yes.

Q.   All right.  Now, have you worked anywhere else since June of 1999 other than Goodyear.

A.   No.

     . . . .

(*Id.* at 159-60).

In *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984), the court stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657.  In *Junkins*, the plaintiff brought an action against the manufacturer of prefabricated buildings to recover for an alleged fraud and reckless misrepresentations in denying the plaintiff a dealership after he purchased land and a building. During his deposition, the president of the plaintiff company testified three times that there was no condition attached to his purchasing the building.  *Id.*, 736 F.2d at 657.  On the motion for summary judgment, the president stated in an affidavit that he had a meeting with representatives of the defendant who told him that if he would purchase one of their buildings then he would be awarded the dealership.  *Id.*  Affirming the trial court's grant of summary judgment for the

13

defendant, the court stated:

> Under these facts as presented, we agree with the district court that the affidavit constituted a sham. When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

*Id.*

Based on the information presently before the court, Thomas' deposition is not so

inconsistent with his statement in the present case that it should be excluded as a sham. The

present situation is not as clear as the one in *Junkins.* In *Tippens v. Celotex Corp.*, 805 F.2d 949,

953-54 (11th Cir. 1986), the court stated:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).
>
> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins,* at 657.
>
> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. *See Choudhry v. Jenkins,* 559 F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's

testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert denied sub nom., Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition. *Kennett-Murray, Corp. v. Bone*, 622 F.2d 887, 894 (5ᵗʰ Cir. 1980).

(Doc. 19, Thomas Affidavit). The court finds that the motion to strike the affidavit, particularly

the portion referencing the year 2000, is due to be denied.

## V. DISCUSSION

### A. Direct Evidence

In discussing direct evidence, the Eleventh Circuit Court of Appeals has stated as follows:

> . . . . We have defined direct evidence of discrimination as evidence which reflects "'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11ᵗʰ Cir. 1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11ᵗʰ Cir. 1990)). In other words, the evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's [race]ism. As a result, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" will constitute direct evidence of discrimination. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11ᵗʰ Cir. 1990) (citations and quotations omitted); *see also City of Miami*, 870 F.2d at 582. An example of "direct evidence would be a management memorandum saying, 'Fire Earley--he is too old.'" *Earley*, 907 F.2d at 1082. . . .

*Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11ᵗʰ Cir. 1999), *cert.*

*denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000). The court has further

explained the impact that direct evidence has on an employment discrimination case. The court

stated:

> "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of University of Alabama*, 91 F.3d 1449, 1453 (11ᵗʰ Cir. 1996); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11ᵗʰ Cir.), *cert. denied*,

15

> 467 U.S. 1204, 104 S. Ct. 2385, 81 L. Ed. 2d 344 (1984).  The basis for the
> analysis is that once a plaintiff produces direct evidence of a discriminatory
> motive, and the trier of facts accepts this testimony "the ultimate issue of
> discrimination is proved." *Bell*, 715 F.2d at 1556.  As such, "the defendant may
> avoid a finding of liability only by proving by a preponderance of the evidence
> that it would have made the same decision even if it had not taken the [illegitimate
> criterion] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.
> Ct. 1775, 1795, 104 L. Ed. 2d 268 (1989).

*Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 961-62 (11th Cir. 1997).  *See also Bass v.*

*Board of County Commissioners*, 242 F.3d 996, 996 (11th Cir. 2001) (quoting *Early v. Champion*

*Int'l. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).  "Remarks . . . unrelated to the decision-

making process itself are not direct evidence of discrimination."  *Standard v. A.B.E.L. Servs.,*

*Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

The plaintiff argues that Spiegle's comment, "Plaintiff's 'black ass,'" and his "regularly

making racially derogatory jokes and using racial slurs" constitutes direct evidence of

discrimination.  (Doc. 18, p. 9).  The defendant argues in its reply memorandum in support of the

motion for summary judgment that there is no direct evidence.  (Doc. 21, pp. 3-4).  The plaintiff

refers to the situation when he went to see Putman after he heard Spiegle ordering parts and

telling the supplier that "there's no rush on them."  (Doc. 15, Ex. 1, p. 197).  When they went

outside and talked to Spiegle, he (Spiegle) "blurted out, well, why don't you just kiss his black

A-S-S while you're at it?"  (*Id.* at 197-98).  The plaintiff turned to Putman and asked if he had to

put up with that and Putman told him he did not.  As a consequence, Spiegle was moved to

another store.  (*Id.* at 198-99).

Spiegle's remark fails to qualify as direct evidence because it falls into the realm of

"stray remarks" or a remark "unrelated to the decisional process itself."  *Alton Packaging*, 901

F.2d at 924.  In *Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997), the Eleventh Circuit

16

composed the following list of cases in which it decided whether certain remarks constituted

direct evidence:

> We have defined direct evidence as "evidence, which if believed, proves existence
> of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.*, 833
> F.2d 1525, 1528 n.6 (11th Cir. 1987) (citation, emphasis, and brackets omitted).
> Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*,
> 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one
> interpretation, *see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2
> (11th Cir. 1996), does not constitute direct evidence.  In a long line of cases, this
> Court has found direct evidence where "actions or statements of an employer
> reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination
> or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d
> 1549, 1555 (11th Cir. 1990).  *See Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928,
> 930 (11th Cir. 1995) (holding that statement questioning whether "sweet little old
> lady could get tough enough" to do job and statement that "a woman was not
> competent enough to do this job" constitute direct evidence); *Burns v. Gadsden
> State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990) (holding that
> statement that "no woman would be named to a B scheduled job" constitutes
> direct evidence); *Caban-Wheeler*, 904 F.2d at 1555 (holding that defendant's
> statement that program needed a black director constitutes direct evidence);
> *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990)
> (holding that general manager's statement that "if it was his company, he
> wouldn't hire any black people" and production manager's statement that "you
> people can't do a ---- thing right" constitute direct evidence); *E.E.O.C. v.
> Beverage Canners, Inc.*, 897 F.2d 1067, 1068 n.3, 1072 (11th Cir. 1990) (holding
> that plant manager's constant barrage of racial slurs and statements such as
> "[t]hose niggers out there will not get anywhere in this company" constitute direct
> evidence); *Sennello v. Reserve Life Ins. Co.*, 872 F.2d 393, 394, 395 (11th Cir.
> 1989) (holding that statement that "we can't have women in management"
> constitutes direct evidence); *Walters v. City of Atlanta*, 803 F.2d 1135, 1141-42
> (11th Cir. 1986) (holding that memorandum requesting a new list of candidates
> because "current register . . . does not include any minority group representation"
> constitutes direct evidence); *Wilson v. City of Aliceville*, 779 F.2d 631, 633, 636
> (11th Cir. 1986) (holding that mayor's statement that "he wasn't gonna let no
> Federal government make him hire no god-dam nigger" constitutes direct
> evidence); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563 (11th Cir.
> 1985) (holding that college president's statement that he saw no reason for a
> woman to have a second job and statement that males had families and needs that
> female plaintiff did not [sic] constitute direct evidence); *Miles v. M.N.C. Corp.*,
> 750 F.2d 867, 874-75 (11th Cir. 1985) (holding that plant manager's statement that
> he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes
> direct evidence); *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1553, 1557 (11[th]

Cir. 1983) (holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence); *but see Harris*, 99 F.3d at 1082, 1083 n.2 (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence). As we have explained in the age discrimination context, the quintessential example of direct evidence would be "a management memorandum saying, 'Fire Earley--he is too old.'" *Earley*, 907 F.2d at 1081; *see also, e.g., Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11ᵗʰ Cir. 1987) (giving virtually identical example).

*Merritt,* 120 F.3d at 1189-90. Under the circumstances, the court cannot find that Spiegle's remark is direct evidence. It is, however, circumstantial evidence for the court's consideration.

The plaintiff argues that other statements that were made while at work constitute direct evidence. He says that Rylant, a coworker, "used the 'N' word" and would tell "some sort of concocted racial joke." (Williams Depo. at 36, 193). As already noted, the plaintiff could not recall the joke because "it went in one ear and out the other." (*Id.* at 194). He did not complain to anyone in management.[8] (*Id.*). He also stated that Spiegle would also tell racial jokes, but he could not specifically recall any specifics other than the fact that during one of the jokes Spiegle "made a reference between blacks and monkeys." (*Id.* at 194-95, 200-01).

Doug Smith, a co-employee, also told similar jokes, but the plaintiff did not complain because he felt that Smith was "mentally slow" and he was just repeating what he saw and heard. (*Id.* at 201-03). In support of his claim that there is direct evidence of discrimination in this case, the plaintiff also cites to an incident involving the police that happened around April 1, 2000. Specifically, the testimony of Putman at his deposition shows that he knew from "hearsay," because he was not there, about an incident involving the police. (Putman Depo. at p. 51-55). What Putman learned from talking with the plaintiff and Spiegle was that Spiegle had told the

---

[8] He did say that Spiegle was around when Rylant told racial jokes. (Williams Depo. at 195).

plaintiff not to align a particular car because he was going to do it when he returned.  (*Id.* at 56-60).  He then left to pick up a part and the plaintiff asked a salesman in the front office if he could do it.  (*Id.* at 57).  The salesman said he could.  (*Id.*).  When Spiegle returned, he was upset.  (*Id.*).  The plaintiff was told to leave for insubordination, but refused to leave.  (*Id.* at 52-54).  The police were called.  Spiegle ultimately left.  (*Id.* at 54-55).

Although the plaintiff cites to these incidents in the section of his brief on direct evidence, the court does not find that any of them constitute such evidence.  They are "stray remarks" or remarks "unrelated to the decisional process itself."  *Alton Packaging*, 901 F.2d at 924.  They are, however, relevant to the plaintiff's hostile environment claims.

### B. Generally: *McDonnell Douglas* Analysis

The Supreme Court's disparate treatment cases, such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), provide the appropriate starting point for evaluating the plaintiff's § 1981 claims.  *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994).  Under the applicable standard in a case like this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).  Once the plaintiff establishes a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S.

19

at 802; *Burdine*, 450 U.S. at 254; *Combs*, 106 F.3d at 1528. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55).

Once the employer meets its burden of production, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993); *see also Burdine*, 450 U.S. at 255 & n.10, leaving the elements of the prima facie case. *Combs*, 106 F.3d at 1528. When those elements are accompanied by evidence of pretext or disbelief of the defendant's proffered explanation, they may permit, in some instances, a finding for the plaintiff. *Id.* at 1529; *see also Hicks*, 509 U.S. at 511, *Evans*, 131 F.3d at 963. The plaintiff, however, always retains the ultimate burden of proving that he was the victim of intentional discrimination. *Hicks*, 509 U.S. at 508; *Burdine*, 450 U.S. at 253.

The court's task in deciding the defendant's motion for summary judgment is limited. The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct. . . . The district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (citations omitted).

20

## C. Application of *McDonnell Douglas*

### 1. Disparate Treatment

The plaintiff's first general claim is premised on a disparate treatment theory. Specifically, he alleges he was discriminated against in his work assignments and pay. It is unlawful for Goodyear to discriminate against the plaintiff with regard to his compensation, terms, conditions, or privileges of employment, because of such individual's race. *See* 42 U.S.C. § 2000e(a)(1). In the usual situation under *McDonnell Douglas*, [the] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "In order to establish job discrimination in . . . assignments, a plaintiff must meet a burden similar to the one required for showing discrimination in promotions." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1344 (11th Cir. 2000). More particularly, the plaintiff must show that he was qualified for the job, that despite his qualifications he was not given the job or assignment and that after the rejection, the assignment was given to someone else having the plaintiff's qualifications. *See Jefferies v. Harris County Community Action Ass'n.*, 615 F.2d 1025, 1030 (5th Cir. 1980) ("In order to establish a prima facie case, a plaintiff must show that (1) she belongs to a group protected by Title VII, (2) she applied for and was qualified for a job for which the employer was seeking applicants, (3) despite her qualifications she was rejected, and (4) after her rejection the position remained open and the employer continued to seek applicants among persons having plaintiff's qualifications.").

21

Although the assignment and pay claims are related, the court finds that it is necessary and appropriate to consider the claims individually. The plaintiff asserts that Spiegle discriminated against him in assigning him because Spiegle "pulled" tickets for Huey, allowing him "the most favorable jobs so he could accumulate the most labor hours." (Doc. 18, p. 11). The defendant asserts that the claim is due to be dismissed for a number of reasons: (1) the plaintiff's evidence proves "nothing;" (2) he did not suffer an adverse employment action; and, (3) the plaintiff has failed to show he lost any pay or suffered some change in his employment. (Doc. 21, p. 4).

Regarding the defendant's claims, the record demonstrates that the plaintiff did in fact testify that Spiegle was "pulling" tickets that resulted in more work being assigned to Huey. He stated:

> Q. Tickets being pulled means we got – Wendell Ray and Harold Putman are writing tickets up front. You have eight or ten tickets on the hook. All three techs get a ticket. Now, you got a service manager, which is Spiegle, Darryl Spiegle. He'll go through them and pick the potential ones that people that he done talked to on the phone and told them what exactly what done to their vehicle that might be a potential good paying job, that's how Mr. Huey was doing such a big labor rate at each week, because you got somebody pulling your tickets for you.
>
> Q. You say pulling the tickets, you mean deciding –
>
> A. Who is going to work on what vehicle. Because, okay, I'm the service manager. Mr. Gray call (sic) and say (sic) look, Wyatt, I want front brake job and two drive axles and go ahead and do a maintenance tune-up and oil change while you got it in.
>
> Okay. that ain't going to get written on that ticket. It gets written up maybe oil change or maintenance tune-up, and then when it hit (sic) Mr. Huey's hand, it's got drive axles written on it, front brakes written on it, whatever else that he done told me to put on there.
>
> Now, it ain't subjected to everybody up there. It's held out, because he

22

> had to write this extra stuff on there.  That's what pulling tickets means.  He's got a nail or hook that the tickets are hung on.  The ticket that he done been talked to about or know that is some additional supposed to be added to that ticket, that ticket will not stay on that hook.

(Williams Depo. at 184-86).  Additionally, the court has reviewed the weekly[9] "Employee Services List[s]" for the period from about November 13, 1998, through April 2, 2000, for the plaintiff, Huey, and the temporary technicians.  They show the various jobs performed by the technicians and the hours and costs billed.  They further show that for each week, Huey billed more labor hours and had a greater labor total than the plaintiff.  Additionally, as a general rule, the hours and costs billed by the plaintiff and the other technicians (King and Dennison) varied from week to week.  As can be seen by the court's limited analysis of the records, the difference in the amount of work given to and done and billed by Huey is substantially more than that given to and done and billed by Williams.[10]  The court finds this sufficient to state a *prima facie* case of

---

[9] The lists are done weekly; however, some weeks are missing from the exhibit.

[10] The court has listed below the total billed hours for the auto technicians – Williams, Huey, King, and Dennison – as reflected in the "Employee Services List[s]" for the relevant period.  (Doc. 17, Ex. 4).

| | WILLIAMS | HUEY | KING |
|---|---|---|---|
| 11/19/98 | 35.7 | 67.8 | 34.1 |
| 12/03/98 | 43.4 | 77.5 | 7.3 |
| 12/10/98 | 27.4 | 48.7 | 16.9 |
| 12/17/98 | 35.7 | 71.4 | 35.2 |
| 12/24/98 | 10.7 | 52.8 | 42.6 |
| 12/31/98 | 39.3 | 42.3 | |
| 01/07/99 | 35.5 | 49.5 | 31.5 |
| 01/14/99 | 42.30 | 74.50 | 45.50 |
| 01/21/99 | 38.5 | 61.4 | 30.30 |
| 01/28/99 | 44.4 | 42.1 | 43.3 |
| 02/04/99 | 43 | 82.5 | 44.9 |
| 02/11/99 | 32.1 | 48.3 | 38.9 |
| 02/18/99 | 34.2 | 56.2 | 43.5 |
| 02/25/99 | 35.9 | 48.5 | |
| 03/04/99 | 20.9 | 61.3 | |
| 03/18/99 | 38.3 | 64 | |
| 03/25/99 | 28 | 67.2 | |
| 04/15/99 | 36.4 | 72.8 | |
| 04/22/99 | 16 | 65.5 | |
| 04/29/99 | 23.6 | 59.6 | |
| 05/06/99 | 36.7 | 57.5 | |

23

discrimination as to the assignment claim. The court further finds that a straight-forward application of the "undisputed evidence" shows that making assignments in this manner resulted in Huey being paid more than the plaintiff because he was assigned work with more labor hours. Thus, if the jury finds that the assignments were made in a discriminatory fashion, it would have a basis for finding that he suffered monetary damages. The court cannot find under the present circumstances that the plaintiff's allegations are purely conclusory. His deposition testimony included an example and explanation of how Huey was allegedly "pulling" tickets. The records

| | | | |
|---|---|---|---|
| 05/13/99 | 31.5 | 51.4 | |
| 05/20/99 | 23.8 | 62.3 | |
| 05/27/99 | 42.2 | 63.9 | |
| 06/03/99 | 37.6 | 58.2 | |
| 06/10/99 | 35.3 | 61.3 | |
| 06/17/99 | 38 | 66.5 | |
| 06/24/99 | 26 | 51.6 | |
| 07/01/99 | 51.5 | 71.6 | |
| 07/08/99 | 22.1 | 50.1 | |
| 07/15/99 | 19 | 75.7 | |
| 07/22/99 | 18.5 | 80.1 | |
| 07/29/99 | 49.1 | 53.5 | |
| 08/05/99 | 50.7 | 72.3 | |
| 08/12/99 | 26 | 96.8 | |
| 08/19/99 | 39.3 | 74.6 | |
| 08/26/99 | 55.9 | 72.3 | |
| 09/20/99 | 54 | 60.6 | |
| 09/02/99 | 36.4 | 46.2 | |
| 09/16/99 | 42.3 | 67.3 | |
| 09/23/99 | 35.7 | 44 | |
| 09/30/99 | 28 | 46.6 | |
| 10/14/99 | 28.7 | 50.4 | |
| 10/28/99 | 45.8 | 62.8 | |
| 11/04/99 | 13.8 | 77.3 | |
| 11/11/99 | 28.6 | 67.6 | |
| 11/18/99 | 37.3 | 63.4 | |
| 11/25/99 | 4.8 | 62.6 | |
| 12/02/99 | 28.8 | 100.9 | |
| 12/09/99 | 36.9 | 63.9 | |
| 01/13/00 | 37.7 | 47.6 | |
| 02/03/00 | 30.1 | 68.7 | |
| 03/02/00 | 31.9 | 66.6 | DENNISON |
| 03/23/00 | 30.1 | 48.0 | 33.1 |
| 04/06/00 | 47.6 | 51.3 | 38.6 |

tend to corroborate his testimony as does the affidavit of Thomas. Summary judgment is therefore not appropriate on this limited claim.

To the extent that the defendant asserts that the plaintiff "cannot show that [the assignments] were based on intentional race discrimination." (Doc. 14, p. 9). The record reveals that the plaintiff was qualified to perform the responsibilities of an auto technician. This court recognizes that the defendant has the right to assign jobs to technicians who are capable of performing the work; however, there is insufficient evidence to show that the plaintiff could not perform the work that was being assigned to Huey. To the contrary, he has offered testimony concerning his lengthy service and experience with the defendant and his possession of various certificates in auto repair. Although this court should not and cannot act as a "super-personnel department that reexamines an entity's business decisions," the court must find in the present situation that the plaintiff has presented sufficient evidence to overcome the defendant's motion for summary judgment. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

In the next claim, concerning pay, counsel for the plaintiff asserts that the plaintiff was paid less than Huey "even though the Plaintiff had approximately 10 years more experience working for the Defendant and had more certifications than Mr. Huey." (Doc. 18, p. 11). The defendant retorts that Huey was paid more per hour "because of his productivity, accuracy, speed, initiative, experience, equipment, and job enthusiasm." (Doc. 14, p. 10).

In order to make a prima facie showing on the disparate pay claim, the plaintiff must demonstrate that (1) he belongs to a racial minority and (2) he was paid less than non-minority employees performing substantially similar work. *See Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 598 (11th Cir.), *cert. denied*, 513 U.S. 919, 115 S. Ct. 298, 130 L. Ed. 2d 212 (1994). The

"similarity" requirement for the plaintiff is relaxed in such cases and the defendant's burden in rebutting the prima facie case is "exceedingly light." *Mulhall*, 19 F.3d at 598.

The court is satisfied that the plaintiff has established a *prima facie* case. He was being paid less than Huey. The defendant has offered various reasons for the difference in hourly pay. To overcome the motion, the plaintiff has offered the affidavit of Richardson, stating that "the [p]laintiff was the best Auto Tech there, both in terms of efficiency and skills, and that he witnessed the [p]laintiff do any and all types of work necessary to a vehicle." (Doc. 18, p. 11).

Even accepting Richardson's affidavit with full force and effect, all it shows is that over three years prior to the relevant period, in 1995, when he worked with the plaintiff, he judged him to be "the fastest and most efficient Auto Tech [he] ha[d ever] seen and he [could] do any type of work on a vehicle." (Doc. 14, Ex. 5). This glowing testimonial is of limited value because it offers no comparison by Richardson between Williams and Huey. In fact, there is no reference in the affidavit to Huey. This is insufficient. More importantly, however, neither Richardson's affidavit nor the remainder of the record disputes other significant facts, including, that Huey owned an automobile repair shop prior to working for the defendant; that his past experience better prepared him for the varied jobs to be performed by the technicians; and, that he brought additional diagnostic equipment from his former shop with him. (Putman Aff. at ¶¶ 6-7). "[T]he plaintiff has [not] cast sufficient doubt on these, the defendant's, proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" *Combs*, 106 F.3d at 1538, (citing *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)). Accordingly, summary judgment is due to be granted on this claim.

26

## 2. Hostile Environment

The plaintiff next asserts that he was subjected to a hostile work environment. He premises this claim on the following actions: Rylant and Smith telling offensive jokes; his being disciplined and touched by Putman for revving the engine of a customer's car;[11] and, Spiegle's conduct, including the inappropriate comment discussed earlier in the section on direct evidence. (Doc. 1, ¶ 6). The defendant asserts that the claim is deficient as a matter of law. (Doc. 14 at 12-15).

In order to establish a hostile environment claim, Williams must demonstrate (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on his race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatory abusive working environment; and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing *Henson v. Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000). Establishing the fourth factor includes a subjective and an objective component. *Mendoza,* 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The employee must "subjectively perceive" the harassing conduct as "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and this perception must be objectively reasonable. *Id.* The employee's working environment must be such that, considering all the

---

[11] In the complaint, the plaintiff alleges that he was grabbed around the neck and choked. (Doc. 1, ¶ 6). There is no evidence of any choking in the record as alleged. A more appropriate characterization would be that Putman grabbed him at the neck and moved him forward. (Williams Depo. at 177-78).

27

circumstances, a reasonable person in the employee's position would consider it hostile and abusive, and the employee must subjectively believe it to be abusive as well. *Mendoza*, 195 F.3d at 1246 (citing *Harris*, 510 U.S. at 21-22 and *Oncale v. Sundowner*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201, 208 (1998)).

The defendant generally asserts that the plaintiff has failed to show that the treatment he was subjected to satisfies the objective component of the fourth element. (Doc. 14, p. 13). It further asserts that the plaintiff cannot show that the incident concerning his being disciplined for revving a customer's car engine was because of his race since she "yelled" at Parsons and other employees. (Doc. 14 at 12-13).

The court finds that the plaintiff does not meet the fourth element of the prima facie case because the complained-of-actions are not sufficiently severe or pervasive to create an abusive working environment. The Eleventh Circuit has stated that "[t]he objective component of the severe and pervasive element prevents the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [ ] jokes, and occasional teasing from falling under Title VII's broad protections." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (quoting *Faragher*, 524 U.S. at 778), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001). The statements and conduct must be examined collectively to determine whether they meet the objective threshold for sufficiently severe or pervasive conduct which would satisfy the fourth *Mendoza* factor. *Gupta*, 212 F.3d at 583; *see also Mendoza*, 195 F.3d at 1246. In determining the objective component in this analysis, the Supreme Court requires that this court consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance;

28

and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002), *citing Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. at 371); *Mendoza*, 195 F.3d at 1246 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)). The conduct should be considered in view of the totality of the circumstances, not in terms of isolated incidents, to determine "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the employee's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246.

In *Miller*, the conduct was frequent in that the "name-calling permeated the Dothan facility- [the shop foreman (Galpin)] hurled the ethnic slurs at Miller three to four times a day" and "Miller's duties required him to go into the service area and interact with Galpin on a daily basis, which means he was unavoidably exposed to the harassing comments throughout the approximately one month period;" it was sufficiently severe in that "Galpin and other technicians in the Service Department used the derogatory names in an intimidating manner, shouting them at Miller during the course of berating him for his job performance, or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him;'" it was humiliating and degrading to Miller in that "[t]he very nature of the coworkers' utterances, coupled with the fact that they were directed at Miller and were sometimes used in the course of reprimanding him in front of others;" and "Galpin's behavior prevented Miller from performing his job, on at least one occasion." *Miller*, 277 F.3d at 1276-77.

The behavior challenged here, when viewed in a light most favorable to the plaintiff, is insufficient to satisfy the *Harris* factors. Spiegle's conduct, while certainly not acceptable, does

29

not rise to the level necessary to state a prima facie case. The conduct in this case is not

sufficiently frequent or severe to overcome the motion for summary judgment. Although

Williams subjectively perceived the conduct as being sufficient to alter the terms and conditions

of his employment, the court cannot find that a reasonable person in the plaintiff's circumstances

could find that it was sufficiently hostile and abusive. The frequency of the conduct in this case

is in no way similar to the frequency in *Miller*. It is also not sufficiently severe. Although

offensive at times, the court does not find the actions of Spiegle, Smith, or Rylant physically

threatening or sufficiently humiliating to the extent of the comments and actions in *Miller*.

Although the incident with Putman involved touching, it was of short duration and occurred only

once. That is not sufficient under the circumstances to overcome the motion for summary

judgment. Additionally, there is nothing in the record to suggest that race was a motivating

factor. Finally, the court does not find that the evidence is sufficient to show that the

complained-of conduct unreasonably interfered with Williams' performance of his job.

Although the record shows that Williams was "clocked out" on the date of the touching incident

with Putman, this is not enough to create a hostile environment in the present case.[12]

## VI. CONCLUSION

Based on the foregoing, the court finds that the defendant's motion to strike (doc. 22) and

the defendant's motion for summary judgment (doc. 13) is due to be granted in part and denied in

part. An appropriate order will be entered.

---

[12] The court notes that the plaintiff did not retort the defendant's challenges to his hostile environment claim that were advanced in its brief in support of the motion for summary judgment. Accordingly, the claim is due to be deemed abandoned. *See Resolution Trust Corp.v. Dunmar Corp.*, 43 F.3d 587, 599 (11ᵗʰ Cir.), *cert. denied*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

**DONE**, this 2ⁿᵈ day of May, 2002.

**JOHN E. OTT**
United States Magistrate Judge